141 F.3d 1176
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Kenneth JEPPSON, Petitioner,
v.
Director, Office of Workers' Compensation Programs; Svend
Asp; Preston King; d.b.a. Northern Fiberglass
and Urethane Foam; Industrial Indemnity
Company, Respondents.
 No. 96-70921.
 BRB No. 94-2213.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Mar. 6, 1998.
Decided Mar. 25, 1998.
 
 Petition for Review of an Order of the Benefits Review Board.
 Before SCHROEDER, ALARCON, and HAWKINS, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Kenneth Jeppson appeals the Benefit Review Board's order, automatically affirming an administrative law judge's ("ALJ") denial of disability benefits under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901-950. Because the ALJ's findings that no employment relationship existed between Jeppson and Svend Asp or between Jeppson and Preston King at the time of Jeppson's injuries are not supported by substantial evidence, we reverse.
 
 
 3
 * We review an ALJ's decision to deny a requested continuance for clear abuse of discretion. See De La Cruz v. INS, 951 F.2d 226, 229 (9th Cir.1991). Although we are troubled by the events that occurred as a result of the ALJ's denial of Jeppson's motions for a continuance (stipulated to by both Asp and King), we find the denial does not amount to an abuse of discretion.
 
 
 4
 Jeppson's first motion for a continuance, on June 3, 1992, did not meet the standards set out in 20 C.F.R. § 702.337(b). First, Jeppson's attorney's state trial was not scheduled before the administrative hearing. Second, Jeppson did not show that the administrative hearing and the state trial would definitely conflict. The ALJ also noted that Jeppson's attorney had known of the conflict for almost two months before bringing the motion for a continuance. We conclude that the ALJ did not abuse his discretion in denying Jeppson's first motion.
 
 
 5
 Jeppson's second motion for a continuance, on June 15, 1992, also did not meet the regulatory standards for continuing a formal hearing. The motion was untimely as it was made less than ten days before the case would be called. When the formal hearing proceeded in Jeppson's absence, the ALJ left the record open to allow Jeppson to explain his reasons for failing to attend the hearing in a deposition. At this post-hearing deposition, Jeppson revealed that he had been in Seattle from June 13-21 for a personal visit and then again from mid-July through September to pick up a settlement check. Thus, Jeppson did not demonstrate that "extreme hardship" caused him to miss the formal hearing. The ALJ did not abuse his discretion in denying Jeppson's second motion.
 
 II
 
 6
 Because the ALJ denied Jeppson's motions for a continuance and the formal hearing proceeded in Jeppson's absence, the only way to get Jeppson's version of events into evidence was to admit Jeppson's May 1991 deposition. The ALJ, however, refused to admit Jeppson's pre-hearing deposition. We review an ALJ's evidentiary rulings for an abuse of discretion, see Atlantic-Pacific Constr. Co. v. NLRB, 52 F.3d 260, 263 (9th Cir.1995), and we find such abuse here.
 
 
 7
 An ALJ is not bound by common law or statutory rules of evidence. See 33 C.F.R. § 923(a). Instead, an ALJ must "make such investigation or inquiry or conduct such hearing in such manner as to best ascertain the rights of the parties." Id. Without any evidence of Jeppson's story either by deposition or live testimony, the ALJ could not and did not conduct the hearing so as to best ascertain the employment relationship between Jeppson and Asp or King. The ALJ's concerns regarding the age of the deposition or his inability to assess Jeppson's credibility are valid but do not overcome the severe prejudice to Jeppson.
 
 
 8
 Moreover, the LWCHA regulations allow for the admission of Jeppson's deposition. A deposition may be used at a hearing if the witness is more than 100 miles from the place of the hearing, 29 C.F .R. § 18.23(a)(4)(ii), or if exceptional circumstances make it desirable to use the deposition, 29 C.F.R. § 18.23(a)(4)(v). Both of these situations existed: Jeppson was on a fishing boat off the coast of Alaska on the day of the hearing and, consequently, his counsel had no way to present Jeppson's version of events except through Jeppson's deposition.
 
 
 9
 Neither Asp nor King would be prejudiced by the admission of Jeppson's deposition in lieu of trial testimony because both were "represented" at the deposition. See 29 C.F.R. § 18.23(a). Asp noticed the deposition and cross-examined Jeppson under oath. Furthermore, Asp potentially faced liability for Jeppson's compensation if Jeppson was injured while working as King's employee because a contractor is liable to a subcontractor's injured employee if the subcontractor fails to pay compensation. See 33 U.S.C. § 904(a). Because King carried no longshore insurance coverage, Asp could be liable to Jeppson, as King's employee, for LHWCA benefits. At the deposition, Asp was equally interested in proving that no employment relationship existed between Jeppson and Asp or between Jeppson and King. Therefore, King would suffer little prejudice if the deposition was admitted against him at the formal hearing. This is especially so when compared to the severe prejudice to Jeppson if his deposition were not admitted.
 
 
 10
 For these reasons, we conclude the ALJ abused his discretion in failing to admit Jeppson's pre-hearing deposition at the formal hearing. Normally, we would remand to the ALJ to weigh this evidence against the hearing testimony of Asp and King to determine whether an employment relationship existed between Jeppson and Asp or King at the time of Jeppson's injuries. In this case, however, a new evidentiary hearing is unnecessary. We conclude that, even with the exclusion of Jeppson's deposition from the hearing, substantial evidence does not support the ALJ's findings.
 
 III
 
 11
 We review the Board's decision for errors of law and adherence to the substantial evidence standard. See Port of Portland v. Director, OWCP, 932 F.2d 836, 838 (9th Cir.1991). Because the Board automatically affirmed the ALJ's decision without reviewing the case, we must determine whether substantial evidence supports the ALJ's decision.
 
 
 12
 In general, compensation law presumes that a worker does not gratuitously volunteer his services. According to the leading treatise on compensation law, "the performance and acceptance of valuable service normally raises an implication that payment for the services is expected." 3 Arthur Larson, Workers' Compensation Law § 47.41 (1997); see Symanowicz v. Army and Air Force Exch. Serv., 672 F.2d 638, 642 (7th Cir.1982) (quoting Larson, § 47.41); see also Port of Portland, 932 F.2d at 840 n. 3 (citing Professor Larson's treatise). There are three exceptions to this presumption: performing voluntary public-service or charitable duties; helping a family member; and assisting another with a view to furthering one's own interests. See Larson, § 47.41(a), (b), (c). When a worker receives or expects to receive any kind of pay for his services, he is an "employee" for the purposes of workers' compensation.
 
 
 13
 Here, the general implication that Jeppson expected payment for his work applies. As evidenced by King's testimony, Jeppson performed caretaker and repair duties on the MAX. Asp characterized Jeppson as a "house sitter[] of the boat" and acknowledged that someone had to check the bilge pumps and generator oil levels daily. The evidence clearly shows that Asp accepted Jeppson's caretaker services. As for King, he does not dispute that Jeppson performed and he accepted the valuable service of unloading sandbags. Therefore, Jeppson falls within compensation law's definition of an "employee" as one who expects to be paid for his services.
 
 
 14
 With this legal background in mind, the ALJ should have been skeptical of Asp and King's claims that Jeppson volunteered his services for free. First, other evidence severely undercut Asp's testimony that he allowed Jeppson to live on the MAX and eat the remaining food "as a friend" and not in exchange for Jeppson's caretaker services. Asp testified that Jeppson was a "house sitter[] of the boat." On a Notice of Controversion of Right to Compensation form dated April 12, 1990, Asp's insurer stated that "Mr. Jeppson also lived aboard the vessel and was responsible for the ship's maintenance." King testified that he saw Jeppson assisting Chris Jones, an engineer hired by Asp, fix the SHARRON A 's engines. King also testified that "somebody has to keep an eye of the bilge" and that anyone working on the boat would check the bilge pumps several times a day. When asked who he made responsible for checking the MAX 's bilge pumps and generators, Asp replied that "King would take care of that for me" or that Jones "could have done it." He never definitively stated that he had charged a particular person to monitor these important functions. It strains credulity to believe that Asp, a sophisticated owner of an expensive fishing boat, would moor this boat at a dock, leave the state for several months, and hope that repairmen he had hired to fix unrelated parts of the boat would perform daily checks of pumps and oil levels. The ALJ's finding is not supported by substantial evidence.
 
 
 15
 Second, King's claim that Jeppson volunteered to unload sandbags for free is severely undermined. At the outset, the ALJ should have been suspicious of King's testimony because King's method of doing business made it impossible for an employee to present documentation of employment. King kept no employment records, paid all laborers in cash, did not withhold federal income taxes from wages, and carried no longshore insurance coverage.
 
 
 16
 Moreover, King's testimony does not make sense. His main defense to Jeppson's claim of employment is Jeppson was a laborer, hired for the "tear-out" portion of the project but unqualified for the skilled sandblasting work. Jeppson, however, was not injured while performing a skilled job; he was injured while lifting and unloading 100-pound sandbags from a truck. King never explained why he would require his small, special crew of skilled workers to unload sandbags or why he would not hire laborers (especially those from the tear-out project) to perform this job. Finally, we find it difficult to believe that Jeppson would "volunteer" to unload sandbags for free after he had worked eight to ten hours a day, six days a week, for three weeks, at $8 an hour, performing physically strenuous work.[1] King's dubious testimony and compensation law's inference against volunteered services require our conclusion that the ALJ's finding is not rational.
 
 IV
 
 17
 We hold that the ALJ's findings that no employment relationship existed between Jeppson and Asp or between Jeppson and King at the time of Jeppson's injuries are not supported by substantial evidence. The ALJ noted that if an employment relationship existed between Jeppson and Asp on December 5, 1989, and between Jeppson and King on December 7, 1989, then Jeppson's injuries would be covered by the LHWCA. Because we resolve the initial issue of LHWCA coverage in favor of Jeppson but numerous issues remain, we remand for further proceedings.
 
 
 18
 AFFIRMED IN PART; REVERSED IN PART AND REMANDED. Each party to bear its own costs.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 King also testified that Jeppson's wife was not cooking for his crew. When confronted with his deposition, he admitted that "she did some cooking and stuff, but her position in the boat is beyond me.... I mean, she was cooking and offered it to the crew and they ate it." Again, to credit King's testimony, the ALJ must have believed that Jeppson and his wife were performing various gratuitous services for Asp, King, and King's crew over several weeks